**Vernice C. NICHELSON, Plaintiff,**

v.

**QUAKER OATS COMPANY, et al., Defendants.**

No. 80–1076.

United States District Court, W.D. Tennessee, E.D.

June 22, 1983.

Avon N. Williams, Jr., Nashville, Tenn., for plaintiff.

Jeremy Sherman, Chicago, Ill., J. Daniel Breen, Jackson, Tenn., for defendants.

## OPINION

HORTON, District Judge.

Vernice Nichelson filed this lawsuit against the Quaker Oats Company, its employees and agents, charging the Quaker Oats Company discriminated against her with respect to the terms, conditions and privileges of her employment because of her race and retaliated against her for exercising rights secured to her by the civil rights laws of the United States. Mrs. Nichelson claims the defendants' conduct violated legal rights guaranteed her under 42 U.S.C. §§ 1981, 1985, 1986 and 2000e *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, and the Thirteenth and Fourteenth Amendments to the Constitution of the United States. Jurisdiction of this Court is invoked pursuant to the above-mentioned statutes along with 28 U.S.C. §§ 1331, 1343(4), 2201 and 2202. Specifically, Mrs. Nichelson charges:

1) The Quaker Oats Company racially discriminated against her when it denied her promotion to the position of Sensory Specialist Supervisor in 1979;

2) She was demoted by the Quaker Oats Company and thereby racially discriminated against in connection with her work assignment during the week of January 11, 1980;

3) The Quaker Oats Company racially discriminated against her when it suspended her for two days in February, 1980, for allegedly falsifying her employee time records; and

4) The Quaker Oats Company racially discriminated and retaliated against her in October, 1980, after she filed discrimination charges against the Quaker Oats Company with the Equal Employment Opportunity Commission (EEOC), by denying her promotion to the newly created position of Quality Assurance Supervisor and by demoting her to the position of Quality Assurance Monitor.

The Quaker Oats Company denies that it has violated the civil rights laws of the United States. Instead, Quaker Oats charges that Mrs. Nichelson has failed to prove, by a preponderance of the evidence, that she was treated differently from white employees because of her race or that its actions were motivated by an intent to discriminate or retaliate against her because of her race and because she filed charges against Quaker Oats with the EEOC. Mrs. Nichelson seeks a declaratory judgment that the Quaker Oats Company, its agents and employees, violated the civil rights laws of the United States, injunctive relief, compensatory and punitive damages, attorneys' fees and costs.

The issue presented in this case is whether Mrs. Nichelson has shown, by a preponderance of the evidence, that the Quaker Oats Company, its agents and employees, violated her legal rights as established by the thirteenth and fourteenth amendments and 42 U.S.C. §§ 1981, 1985, 1986, and 2000e *et seq.* After trial before the Court and after a careful and thorough review of the entire record in this case, the Court finds Nichelson has shown, by a preponderance of the evidence that the Quaker Oats Company violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, specifically § 2000e–2(a)(1) which makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." The Court also concludes that Nichelson has shown by a preponderance of evidence that the Quaker Oats Company violated 42 U.S.C. § 1981 which provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

However, the Court finds that Quaker Oats did not violate the thirteenth and fourteenth amendments or 42 U.S.C. §§ 1985 and 1986. Although several individuals were named as defendants in this lawsuit, the Court finds the evidence in this case related primarily to Quaker Oats, and at an appropriate time the Court will entertain a motion to dismiss the claims against the individuals.

An exhaustive and comprehensive factual background exists in this case. An extensive recital of particular facts is necessary to illustrate the atmosphere and climate in Quaker Oats' Jackson, Tennessee plant. The atmosphere and climate at the plant is evidenced and illustrated by the treatment afforded Mrs. Nichelson and other blacks by defendant's supervisory personnel.

Plaintiff, Vernice Nichelson, a black woman, who completed three years of college, was employed by the Quaker Oats Company on or about August 16, 1976. She is still so employed. Mrs. Nichelson was hired in 1976 as a production worker. In May of 1977, she was promoted to the position of laboratory technician in the plant's Quality Assurance Department where she was trained initially as an analytical laboratory technician. In 1979, she was trained to perform the duties of a microbiological laboratory technician in the Quality Assurance Department. In October of 1980, Mrs. Nichelson was transferred from the job of laboratory technician to the position of quality assurance monitor by Quaker Oats. Since June 1981 and to the time of this lawsuit she has worked as a laboratory technician.

The Quaker Oats Company owns and operates a large frozen food manufacturing plant in Madison County, Jackson, Tennessee. The plant manufactures frozen foods such as waffles, pancakes and pizza. The Quality Assurance Department in the plant controls the quality of incoming ingredients, products in process and finished products at the plant to assure that products are manufactured in accordance with specifications and to eliminate risks to the consumers.

The following management personnel are named defendants in this lawsuit; Mr. Douglas Dean, Employee and Community Relations Manager; Mr. Dale Smith, Quality Assurance Manager; and Mr. Gregory Nold, Laboratory Manager at the Jackson plant.

### SENSORY SPECIALIST SUPERVISORY POSITION

The alleged discriminatory and retaliatory actions against plaintiff began in 1979. Prior to the filing of this lawsuit, Quaker Oats did not post managerial job vacancies. Employees at the plant were made aware of such positions after they had been filled by management.

Mary Wondolowski was hired in 1977 as Sensory Specialist Supervisor. This vacant managerial position was not posted by Quaker Oats. Plaintiff nor any other hourly employee at the plant knew that the position was available. The position of Sensory Specialist Supervisor had been vacant at the plant for some time. Ms. Wondolowski, a white female, was hired for the position in September, 1977. She graduated from the University of California at Davis with a Bachelor of Science degree in Food Science. While enrolled at the University of California at Davis, she took a basic statistics course and a statistics course which emphasized statistical applications to environmental sciences.

The duties of a Sensory Specialist Supervisor included the selection of people for use on taste panels, evaluation of the tasters' judgments and the utilization of statistical techniques for the purpose of testing

the sensory attributes of certain food products.

Mrs. Nichelson testified she observed Ms. Wondolowski and her predecessor in the Sensory Specialist Supervisor position perform their job. Further, Mrs. Nichelson testified she assisted Ms. Wondolowski in her sensory specialist work. Ms. Wondolowski also testified that Mrs. Nichelson, along with others, assisted her in preparing the foods used in the taste panels. However, Mrs. Nichelson did not assist Ms. Wondolowski in the statistical analysis of the taste panels nor in the preparation of a quality assurance sensory manual prepared by Ms. Wondolowski.

Ms. Wondolowski and Mr. Dale Smith testified that in 1979 Ms. Wondolowski began spending far less time on sensory evaluation matters because the use of taste panels was almost completely eliminated. Instead, her duties shifted to a concentration on evaluating in-process weight data, conducting short term capability studies on the processing line, coordinating research tests, preparing a computerized weight control program for collection and statistically analyzing data on pizza products. In recognition of this change in duties, Ms. Wondolowski's job title was changed in 1979 to Quality Assurance Engineer, and the position of Sensory Specialist Supervisor was eliminated. As Quality Assurance Engineer, Ms. Wondolowski continued to be responsible for sensory evaluation work. Mrs. Nichelson does not claim she should have received the position of Quality Assurance Engineer created for Ms. Wondolowski.

■ Mrs. Nichelson asserts Quaker Oats should not have eliminated the position of Sensory Specialist Supervisor in 1979, that she should have been promoted to that position and that she was not promoted because of her race. It is Nichelson's position that she should have been promoted to the position of Sensory Specialist Supervisor in 1979 because she knew the duties of the position as a result of her observance of prior supervisors in that position and because she assisted Wondolowski. She further asserts she could have adequately performed the duties of Sensory Specialist Supervisor if she had received the same training Quaker Oats gave Ms. Wondolowski.

Nichelson admits she was not qualified to do the statistical analysis work required of a Sensory Specialist Supervisor. She testified that after the Sensory Specialist Supervisor position was eliminated, she performed the work of a Sensory Specialist Supervisor and that after her assignment to the monitor position, others performed the work of a Sensory Specialist Supervisor. Specifically, Nichelson stated she continued to do the taste panels but not the paper work. Nichelson testified she had not taken any statistics course.

The Court finds that Mrs. Nichelson has not shown by a preponderance of the evidence that she was qualified and competent to perform the duties of a Sensory Specialist Supervisor or that Quaker Oats' elimination of the position and its failure to promote her to the position were on account of her race. Mrs. Nichelson has not established a *prima facie* case of racial discrimination under Title VII or 42 U.S.C. § 1981 on this asserted racial discrimination claim. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1818, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Nor has Mrs. Nichelson shown by a preponderance of the evidence that she was unfairly denied the training she asserts Ms. Wondolowski received. Mrs. Nichelson testified Ms. Wondolowski was sent to a place where computers were made and there she received some training. During the period Ms. Wondolowski was Sensory Specialist Supervisor, she made several trips to Quaker Oats' corporate offices in Chicago, Illinois, and to its research facilities in Barrington, Illinois, where she reported the quality assurance activities at the Jackson plant and learned of the quality assurance activities conducted at other Quaker Oats' plants. However, Ms. Wondolowski testified that she received no special training by

Quaker Oats to perform her job as Sensory Specialist Supervisor and she received no special computer training while at the Jackson plant. Ms. Wondolowski further testified she made a trip to Chicago in 1981 to purchase a computer for the company.

The Court concludes that Nichelson has failed to substantiate this allegation in her complaint.

### FLOOR ASSIGNMENT

In January of 1980, Mrs. Nichelson charges she was demoted by Dale Smith, Quality Assurance Manager, on a Monday morning following an appearance in court Friday, January 11, 1980. Nichelson was sent from her job as laboratory technician to the plant floor taking temperatures of frozen foods. She stated Mr. Smith accused her of leaving dirty work in the laboratory Friday, January 11, 1980. Quaker Oats contends plaintiff was assigned to the floor only temporarily to separate her from another laboratory technician, Ms. Deborah Hale.

Plaintiff testified she was absent from work on the afternoon of January 11, 1980, because she had been subpoenaed to court. She stated she had so informed Mr. Smith. Mr. Smith testified he was notified by letter sometime in December of 1979 that Mrs. Nichelson was to appear in court on December 28, 1979. However, her appearance in court on December 28, 1979, was not required because the hearing was postponed. Mr. Smith further testified Nichelson never informed him when the hearing was rescheduled and that he did not know she was to appear in court on Friday, January 11, 1980.

Nichelson stated that when she received a second letter in January of 1980 to appear in court on January 11, 1980, she reported to work that morning because she did not have to appear in court until 1:00 o'clock. She worked until 12:00 p.m. on January 11, 1980. She testified that she gave Mr. Smith her letter requiring her appearance in court when she was sitting at the colony counter counting plates and he acknowledged by saying, all right. Subsequent to her court appearance, plaintiff brought a letter addressed to Mr. Douglas Dean indicating she had been in court on January 11, 1980. This confirming letter indicated that a letter of January 10, 1980, had been written to excuse Nichelson for court duty. Smith had no explanation as to why he had not received the letter referred to as the January 10th letter.

Smith testified he remembered twice passing the area in the laboratory where Mrs. Nichelson and Ms. Hale worked and noticed there was some incomplete microbiological testing work on the microbiological side of the lab.

Smith testified when he left work Friday, January 11, 1980, around 4:30 p.m., he noticed there was still incomplete work on the microbiological side. He stated this did not strike him as unusual since often he had observed incomplete work on the microbiological side at that time of the work day. Smith stated he asked Deborah Hale who was assigned to the microbiological side and Ms. Hale told him that was Mrs. Nichelson's assignment. The plaintiff was not in the laboratory when Smith left, and he did not inquire as to her whereabouts. Hale testified she knew Mrs. Nichelson had left work to go to court. Hale was still in the laboratory, and Smith left knowing she would lock the lab.

It is important at this time to note the organizational structure in the laboratory at the Jackson plant.

The organizational structure of defendant's Quality Assurance Laboratory was outlined by Mr. David Johnson, plant microbiologist. There are three kinds of work performed in the laboratory. There is microbiological testing for prevention of public health problems as well as food spoilage. There is analytical and chemical testing for quality of the product, and there is a sensory department for food sensory testing. The heaviest work is in microbiology. The microbiological tests performed in the quality assurance department for identification of bacteria are conducted by placing a food sample in a series of media

at varying times during the day. The most critical test performed in the laboratory is to discover the existence of salmonella bacteria in foods.

Weekend work in the laboratory is primarily microbiological. According to Johnson, microbiological work is necessary on the weekends because bacteria do not cease growing on weekends. Culture tests and other tests have to be continuously performed.

Nichelson worked on the analytical side of the laboratory until October of 1979. Plaintiff then began training to learn the duties of a laboratory technician on the microbiological side. On January 11, 1980, Nichelson was working on the microbiological side in the laboratory. Deborah Hale, a white laboratory technician, was also working in the laboratory that day. Hale had worked on the microbiological side from the time of her employment in 1976, until she was switched in October of 1979, to learn the analytical side. It is Nichelson's testimony that when she left work on January 11, 1980, around noon to go to court, she asked Hale to complete her microbiological work and Hale agreed. Nichelson stated she thought she would be able to return to work.

Hale testified that she did not remember Nichelson asking her to perform her work and that she would have performed the work had she been asked. David Johnson and Dale Smith testified when employees were away from the job on emergencies it was expected that someone at the laboratory would complete things left incomplete. Hale did not complete Nichelson's work or inform Smith that plaintiff's work was incomplete. Nichelson did not return to work on January 11, 1980, since she was not released from court until 5:00 p.m. and her shift had ended at 4:30 p.m. Nichelson testified she called the plant after she was released from court and was told Smith had already left the plant.

On Saturday, January 12, 1980, Smith received a call from Hale shortly after she arrived at the laboratory. Hale told him that she could not do her work because Nichelson had left incomplete work and some of the plates had not been counted for bacteria. Hale testified she called Smith that morning because she did not feel that she should have to stay at the lab and complete the work Nichelson had left as well as her own work. Hale testified she told Smith that she could not remain in the laboratory as long as it would take to get all the work done. Hale stated Smith told her not to worry about it, to go home and he would take care of it.

Smith stated when Hale telephoned him on January 12, 1980, expressing that it would be difficult to complete the work he told her to "stand by in the laboratory" and he would try to get some help. He said he tried to get someone to help her in the laboratory but he was not successful. He stated he telephoned Nichelson and Mrs. Anna Cole, another laboratory technician, to see if they could help Hale, but he received no answer. After he was unsuccessful in obtaining help for Hale, he stated he called Hale at the laboratory and instructed her to close the laboratory and go home, which she did.

Smith did not go to the laboratory that Saturday to determine how much work was left incomplete or to determine whether Hale could have completed the work or salvaged any of the plates within the time she was scheduled to work. Smith asserts he did not have Hale do the work or attempt to do the work himself because he did not want to make a decision as to what tests should be run or completed. He explained that while he was department manager he did not feel qualified and was not qualified to do everything that was required in the laboratory. However, he did testify that he knew if microbiological work was left incomplete for an extended period of time, it could not be salvaged. Hale stated that some of the plates which had been in the laboratory since that Thursday should have been counted by her that Saturday but they were not since Smith allowed her to leave. The record indicated her only work on that Saturday

was a phone call for which she apparently received four hours pay.

The following Monday, Smith transferred Nichelson to the floor taking the temperature of waffles. Smith talked with both Nichelson and Hale that Monday concerning the work in the laboratory. He talked to Hale first. The substance of the conversation between Smith and Hale was testified to by Hale as follows:

I just was talking about I don't want, you know, I was afraid Vernice might be upset with me because I didn't do her work for her, and that's all I told him. I just didn't want, you know, her to be mad at me or anything like that.

Nichelson's testimony at trial regarding the content and manner of her conversation with Smith on the following Monday was as follows:

Q. What happened when you reported to work the following Monday?

A. When I reported to work the following Monday, Mr. Smith called me in his office, and he stated that I had let a whole lot of test results go undone. So he wanted me out of the lab until he got his head straight.

Q. In what manner did Mr. Smith say that to you? Describe, if you will, his tone of voice and his manner and his expression on his face, and that sort of thing.

A. Well, his face was very red. He said, "Mrs. Nichelson, I want you out of this lab until I get my head straight."

Q. I don't mean to try to mimic him yourself. Just describe it in terms of softness, loudness, belligerence?

A. It was in a loud manner. He was very loud when he told me that.

Q. And he said what, now?

A. He wanted me out of the lab until he got his head straight. I was trying to explain to him that the court lasted until 5:00 o'clock. But he opened the door and called Mrs. Wondolowski, who is a white employee, and told her to carry me down and show me what to do on the floor.

Q. All right. Did he give you an opportunity to explain?

A. No sir, he didn't.

Q. Did he ask you any questions or make any investigation whatsoever before sending you down to the floor?

A. No, sir, he didn't.

Smith's version of the conversation is contrary to plaintiff's. He testified that when he talked to Nichelson the following Monday, he inquired why she had left her work incomplete on Friday, January 11, 1980. Plaintiff replied that she had been in court on that day. Smith said he did not recall plaintiff telling him in this conversation that she had notified him when she left for court.

The Court noted at trial that Smith did not appear to be forthright in his answers. The Court is still of this opinion. Based on the trial testimony and a determination by the Court of the credibility of the two witnesses, Nichelson and Smith, the Court finds that Nichelson is the more credible of the two. There is testimony in the record by other witnesses, Wondolowski and Ms. Anna Cole, that Smith was abrupt and had the tendency to be abusive in conversations with employees at the plant. Wondolowski testified she and Smith had disagreements and on one occasion while the two were in the laboratory and in the presence of another employee he used abusive language towards her.

"He got angry with me and took me back into his office and started screaming at me and told me that I was nothing but a 'goddamned smartass bitch,'" Wondolowski testified. She said these comments upset her and she reported the comments to Douglas Dean. "I told Doug Dean what Dale had said to me," Wondolowski stated, "and Doug told me that I shouldn't be concerned about it because I knew how Dale acted."

Smith instructed David Johnson on that following Monday "to go through and

check what materials, what plates, et cetera, could be salvaged and read and analyze them." Smith stated he decided that morning to transfer Nichelson to the floor taking temperatures. He said part of the reason for his decision was he felt there was an air of blame and hostility existing between Nichelson and Hale regarding fault for the ruining of the tests. Hale did not corroborate Smith's claim that Mrs. Nichelson was transferred to separate her from Hale. Hale stated plaintiff had given her no indication that she wished to fight with her or that she was angry with her.

He also stated since Nichelson had been receiving training in microbiological testing and a new set of tests would have to be set up, that week would not have been a good time to continue her training.

Smith stated:

Mrs. Nichelson had been in training the preceding week in microbiology. She had not been totally qualified as a technician in that she was in training for the microbiology part and had not yet felt comfortable to do weekend work by herself. This was not a week that was conducive to good training, because it was a change in sequence, cleaning the lab and starting things over again. So I didn't really feel it was a good time for her to train. I saw no need to change the assignment of Deborah Hale from what she had the preceding week.

However, Mr. Smith's testimony on cross examination indicates Nichelson was competent as a laboratory technician. On the training issue Smith testified as follows:

Q. (By Williams) Do I understand your testimony now to be that Mrs. Nichelson was somewhere in between; that she was competent to do some phases of microbiological lab work but not fully competent to do others?

A. Sir, in our opinion she was fully competent to do the lab work. She had indicated to us that she wanted to continue training, because she did not feel comfortable at doing Saturday work by herself. Therefore, we were granting that wish and giving her as much time for the training as she felt was necessary.

Q. All right. So then get back to my original question, on that Monday you gave as one of the reasons for assigning Mrs. Nichelson down to the floor that she was in training, as I recall, and that—let me see if I can get you exactly right, so I won't misquote you—that Mrs. Nichelson had been in training for microbiological lab work and that it was not a good week for training. So the training that you were talking about was not this work during the week for which you just testified she was fully competent, but simply her feeling that she wasn't fully competent on the Saturday work.

A. The training required the direct attention of the microbiologist, who would not have been able to give her that type of direction during that week. Therefore, it would not have been a good week for training.

Q. Did I understand you? Did you just testify that you felt she was fully competent to do the micro-lab work during the week?

A. Yes, sir. If I had not felt she was competent, I would not have assigned her to that on the preceding Friday.

Q. (By Mr. Williams) Mr. Smith, was the substance of your answer in response to my question as to whether Mrs. Nichelson could not have undergone training in the course of Mr. Johnson correcting what had been invalidated that Saturday in testing, and you said yes, if he assigned it to her, or something like that. Was it your intention by that answer to say yes, she could have undergone training?

A. Yes, she could have.

Mr. Smith indicated that Hale was also in training on the analytical side.

It is plaintiff's assertion that this assignment to the floor for one week in January of 1980 was a demotion and that she suffered humiliation and embarrassment as a result. In the Quality Assurance Department working on the floor was considered a lower level job assignment according to Ms. Anna Cole, a lab technician. Wondolowski testified that a lab technician and a quality assurance monitor were overqualified for the job plaintiff performed while transferred to the floor.

Ms. Pat Vaughn a white production worker on temporary loan to the Quality Assurance Department, had been transferred from Production to take temperatures of waffles at the freezer the previous week. Plaintiff was transferred to take temperatures that following week when Production required Vaughn's return. Ms. Delores Jones, a quality assurance monitor was transferred by Smith to work with Johnson in the laboratory on the micro-lab bench the same week plaintiff was assigned to the floor. Mr. Smith admitted on cross examination that Ms. Delores Jones took plaintiff's place in the laboratory that week. Ms. Jones had worked in the past performing routine laboratory work, washing dishes and preparing media in the laboratory according to Mr. Smith.

It is Quaker Oats' position that Nichelson was not transferred to the floor as punishment or a demotion but was transferred because someone was needed to work on a special project initiated by the company's Director of Frozen Foods Research. Quaker Oats also asserts that the work performed by the plaintiff during the week of January 14, 1980, was the same work performed by white employees.

■ Title VII and 42 U.S.C. § 1981 are coextensive and coterminous federal statutes which afford a federal remedy to an aggrieved litigant who has been discriminated against in employment because of race. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975).

■ A plaintiff such as Nichelson proceeding under Title VII and 42 U.S.C. § 1981 has the burden of proving by a preponderance of the evidence a *prima facie* case of racial discrimination. *McDonnell Douglas, supra; Long v. Ford Motor Co.,* 496 F.2d 500 (6th Cir.1974). Under the *McDonnell Douglas* test, Nichelson may establish a *prima facie* case by showing 1) that she was a member of a racial minority, 2) that she and a similarly placed white person received dissimilar treatment, and 3) that sufficient evidence exists from which the Court can find a causal connection between race and the alleged acts of Quaker Oats. The facts which comprise a *prima facie* case may vary.

■ To prevail under either Title VII or 42 U.S.C. § 1981, Mrs. Nichelson must show by a preponderance of the evidence that race was a factor in Quaker Oats' action transferring her to the floor for one week in 1980. Plaintiff must show a purposeful discrimination in the decision to demote her to the floor by a preponderance of the evidence. *Burdine, supra; Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Mrs. Nichelson is not required to show that the challenged action rested solely on racially discriminatory purposes, but rather that the discriminatory purpose or intent was a factor in the decision.

Mr. Smith testified as to a laboratory technician being assigned to the floor as follows:

Q. When was the last time previous to that (the assignment of plaintiff to the floor) that you had assigned Mrs. Nichelson or any other lab technician to take temperatures for a week on the floor?

A. That test had never been done by a lab technician before on the floor.

Q. All right. So the answer is never?

A. Sir, you asked if I had ever assigned one to take temperatures. I don't know is the answer to that question. I don't know.

Q. You don't know of any time that you ever assigned a lab technician to go down on the floor and take temperatures in a job that you had previously had an hourly employee doing, do you?

A. I don't know of any time, no.

Nichelson informed Dean that she felt her assignment to the floor was punishment for being absent from work because she had to be in court. Dean testified he asked Smith if he transferred Nichelson as punishment and Smith told him no and that she was sent to the floor because of a special project. Dean accepted Smith's explanation and made no further inquiry into plaintiff's charge that she was being punished. Nor does he recall asking Nichelson what circumstances made her think her assignment was discipline.

Mr. Dean stated there are rules at the plant describing the discipline policy, but the supervisors have free reign in disciplining employees. Also he stated supervisors have no specific guidelines to follow when administering discipline. Further, he stated reassignment to another job is not part of any discipline program at the plant.

Nichelson and Hale were both laboratory technicians under Smith's supervision. Nichelson is black, and Hale is white. The clean up required in the laboratory was a result of incomplete work left by both Nichelson and Hale. Both were in training to some extent. There is sufficient evidence in the record from which the Court can reasonably find a causal connection between race and the alleged acts of Quaker Oats. Nichelson has shown sufficient facts to sustain an inference that her transfer to the floor was racially motivated and that she was treated in a dissimilar manner from Hale, a white similarly situated. *Sanders v. Sherwin Williams Co.*, 495 F.Supp. 571, 573 (E.D.Mich.1980). Courts may properly infer discriminatory animus from the actions of the employer upon the establishment of a *prima facie* case "only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible

factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. When the defendant articulates a non-discriminatory reason, the plaintiff may still prevail if she can prove by a preponderance of the evidence that defendant's non-discriminatory reason is merely pretextual. *Burdine, supra; Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 141 (6th Cir.1982). The principles which govern the procedural matters in a Title VII case apply with equal force to a 42 U.S.C. § 1981 action. *Long* at 505.

As previously stated, defendant's articulated reason for demoting plaintiff to the floor to take temperatures of waffles was because she was in training, her training on the microbiological side could not be continued that week, and Smith felt there was some element of blame between plaintiff and Hale. Quaker Oats asserts this assignment was within the job description of a laboratory technician and other employees had been assigned this task on the floor. However, the Court finds the taking of temperatures by other employees was not for punishment. The employees who defendant asserted performed the same test as plaintiff were managerial and supervisory employees for the most part. Gary Haines, Director of Frozen Foods Research and Kent Salisbury, both white, came to Jackson from Barrington, Illinois, to set up the test and took temperatures of frozen waffles. Wondolowski and Dale Smith performed the test. Those employees of Quaker Oats were primarily concerned with making sure the tests were correctly set up and administered to insure the validity of the results. They performed temperature tests in the initial stage of the operation. Those employees cannot be considered to be similarly situated to plaintiff. Pat Vaughn was the non-management and non-supervisory employee assigned to take

temperatures after the studies had been established.

■ Quaker Oats argues plaintiff was not demoted because there was no reduction in her pay when she worked the week on the floor. The Court does not agree with this position. *Black's Law Dictionary* defines demotion as a reduction to a lower rank or grade, or to a lower position. Nichelson's assignment to the floor to take temperatures was a reduction to a lower rank or grade. The fact that she suffered no reduction in pay is not controlling on whether she was demoted. The job of laboratory technician did not usually call for the performance of such mundane tasks as taking temperatures of waffles. This is probably why Pat Vaughn was originally assigned to take the temperatures. Prior to the fall of 1980, regular trips to the floor were required by laboratory technicians for sample collections to be brought to the laboratory for analysis. However, laboratory technicians were not required to take temperature tests on the floor prior to the fall of 1980. The legislative intent behind Title VII and 42 U.S.C. § 1981 is to protect employees from any form of disparate treatment because of race in the terms and conditions of their employment regardless of the label placed on the discriminatory practice. *Gilbert v. General Electric Co.*, 519 F.2d 661, 663 (4th Cir.1975), *rev. on other grounds* 429 U.S. 125, 97 S.Ct. 701, 50 L.Ed.2d 343.

When Vaughn was returned to her regularly assigned job in the production department, Smith had to assign someone to take the tests. He selected Nichelson who was black. When he transferred Nichelson to the floor, he did not allow her to explain why the work was incomplete. Instead, he told her to go to the floor and perform tests until he could get his head together. Hale was merely asked what happened concerning the Saturday work. Hale was allowed to leave her work incomplete without punishment of any kind. She had Smith's permission to leave the work incomplete.

■ Smith asserted Nichelson's reassignment to the floor was neither punishment nor a demotion and he told her so. However, the Court does not accept Smith's assertion that the reassignment was neither punishment nor a demotion. The Court finds Nichelson's reassignment to the floor was punishment and a demotion and Smith's decision to reassign her to the floor was motivated by her race. Race may not have been the sole factor for his decision, but the decision was due in part because of plaintiff's race. *Ford* at 506. No laboratory technician had ever been assigned to take temperatures on the floor. Mr. Nold testified it was not normally within the function of a laboratory technician to go down on the floor and take temperatures, replacing an hourly employee. Nichelson, a black laboratory technician, was admittedly overqualified for this assignment. Smith assigned Delores Jones, a quality assurance monitor, a position beneath plaintiff's, to work in Mrs. Nichelson's place in the laboratory. The Court cannot close its eyes to management decisions motivated by race. Nichelson has carried her burden by proving by a preponderance of the evidence that Quaker Oats' articulated reason, of blame and training, is not the true reason for her demotion. Viewing the record in its entirety, and evaluating the objectivity, sincerity and honesty of the witnesses, the Court concludes that Mrs. Nichelson's demotion for a period of one week was racially motivated. Mr. Smith certainly treated Mrs. Nichelson, a black woman, vastly different from the way he treated Ms. Hale, a white woman. Although this is not a class action, the treatment of plaintiff along with other blacks at the plant by Quaker Oats' officials cannot be ignored by the Court in determining the employer's motives. Title VII and 42 U.S.C. § 1981 tolerates no racial discrimination in employment, subtle or otherwise. *Burroughs v. Marathon Oil Co.*, 446 F.Supp. 633, 638 (E.D.Mich.1978).

### TWO–DAY SUSPENSION

■ Another element of plaintiff's claim alleging racial discrimination in employment concerns a two-day suspension

she received in February of 1980. Nichelson alleges she was suspended on a charge of overstatement of hours worked because of her race. Mrs. Nichelson began receiving training on the microbiological side of the laboratory in October of 1979. The plant microbiologist trained her to perform certain microbiological tests for the purpose of enabling her to work independently on weekends. Smith instructed Johnson to work with Nichelson one weekend before she was assigned to work alone in the laboratory on weekends.

Johnson and Nichelson worked together on Saturday, January 5, 1980. The following Monday when she was recording her time for the previous Saturday, she asked Johnson how many hours he put on his time card. Nichelson said Johnson told her eight hours. Johnson was not a supervisor but on weekends had the authority to tell Nichelson what to do. Accordingly, Nichelson put down eight hours. She testified she and Johnson worked about seven hours that Saturday and that they left the laboratory together. Johnson testified he did not recall any conversation with Nichelson about any time card or whether Nichelson asked him about that subject. He said his own practice was to record work time exactly or as near exactly as possible. Johnson admitted there seemed to be some confusion about employees recording time and management held a meeting with plant employees to clarify the matter.

Weighing the testimony of Nichelson and Johnson, the Court finds the testimony of Nichelson to be the more credible. Nichelson is specific in her testimony that she asked Johnson how many hours he recorded on his time card and he told her he recorded eight. She did likewise. Johnson said he could not recall any such conversation with Nichelson. He did, however, admit there seemed to be some confusion among employees about recording time at the plant.

Nichelson stated that management took no action against her when she reported eight hours on her time card that Saturday she worked with Mr. Johnson. She also stated since she was not familiar with Saturday work she thought it was customary to put down eight hours. In February of 1980, Nichelson worked her first Saturday alone. She again reported eight hours on her time card. She worked about seven hours on that Saturday.

Gregory Nold, Laboratory Manager, reviews employee time sheets at the plant.

In regard to plaintiff's suspension for overstatement, Nold stated he had been at the Jackson plant for only two (2) weeks and was reviewing the time sheets as part of his normal job function. He noticed the plaintiff had eight (8) hours Saturday overtime on her time sheet. He thought that unusual based upon his past experience at the Missouri plant at which he worked. There, it was unusual for an employee to have that much overtime. He stated he also thought it was an unusually high number of hours because he had been in the lab on that Saturday and had not seen the plaintiff. Nold then had a conversation with Wondolowski regarding the Saturday events. Wondolowski told Nold she had left the lab at 3:30 p.m. and locked the lab, but she did not see Nichelson. Nold then stated he decided to discuss the matter with Smith as Nichelson's conduct appeared to be improper. Smith and Nold decided to call Nichelson in to discuss the matter.

When plaintiff reported to work the following Monday, Nold told her to go to the personnel office. Smith and Douglas Dean were in the personnel office when Nichelson and Nold arrived. Nichelson testified that Dean presented her with her time card for the previous Saturday. Dean, Smith and Nold asked Nichelson if she worked eight hours. She responded, no. They then told Nichelson she had recorded eight hours on her time card. Nichelson said she told all three that she and Johnson had done the same thing before, recorded eight hours when they worked less than eight hours. According to Nichelson, Smith stated that she was stealing the company's money and that was a terrible offense. He then asked her to leave the room and wait

until they called her. Thereafter, she was told by Dean that she was suspended indefinitely. Smith told her to go and get her coat and leave the plant.

Nichelson telephoned the plant manager and informed him that she had been suspended indefinitely from her job for doing the same thing she did when she worked the Saturday before with Johnson. After that call to the plant manager, Nold called Nichelson and told her to report to Smith. Nichelson said Smith told her he was sorry the situation happened and that she should not trust Hale. Thereupon she returned to work, she said "as if nothing happened." Nichelson was suspended for two days.

Quaker Oats admits there was a misunderstanding among plant employees as to how they should report time worked during the week and on weekends due to past instructions from their supervisors. During the regular work week, it was a practice, prior to the incident involving plaintiff, for all quality assurance employees to record eight hours straight time pay for work performed even if the actual straight time hours worked on any particular week day was less than eight hours. It was also a practice in the plant for quality assurance employees to record a minimum of four hours on their time sheets when they worked overtime on Saturday. Quaker Oats urges the Court to separate the regular work week time situation in the plant from the Saturday or overtime situation. The Court thinks that argument ignores the solidly established fact in this record that, as Johnson, and other company employees testified, there seemed to be widespread confusion among plant employees about recording time. In fact, management of the plant subsequently met with plant employees and instructed them on how to specifically record time worked. Thereafter, employees were required to record the exact time worked.

In his deposition, Smith stated the general misunderstanding related not to overtime work but to other time. He admitted, however, that in general the time rules were not clear to "our employees." Ms.

Rosa Benson, an employee of Quaker Oats who was originally hired as a production worker in 1976 and promoted to quality assurance monitor in 1978 testified that before Nichelson was suspended employees who worked more than four hours on Saturdays reported eight hours on their time cards regardless of the hours worked, but after Nichelson's suspension, they were instructed to record on their time cards only the actual hours worked.

The testimony of Dean, Smith and Nold is not consistent as to what was said by all parties in the meeting with plaintiff regarding the overstatement of hours. Dean stated he did not learn of the practice of employees overstating hours until after Nichelson was suspended. It is not clear from Smith's testimony when he claims he first learned of the practice regarding overstatement of hours. Smith stated at one time he first learned of the practice when Nichelson mentioned it in the meeting which transpired in his office before her suspension. At another time in his testimony, Smith indicated he was not sure of the exact date he first learned of the practice but he first learned of it after Nichelson's suspension when he held meetings with his employees. There is also testimony in the record by Rosa Benson that Smith instructed her, prior to Nichelson's suspension, to report eight hours on weekends regardless of the time she actually worked. Nold testified that he, Smith and Dean knew, at the time of Nichelson's suspension, of the practice in the plant concerning overstatement of hours. He stated they asked Nichelson to leave the room to discuss what level of discipline she should receive. They discussed what Nichelson had told them about others overstating their time. Nold stated this was one of the factors they considered in deciding to suspend Nichelson and then investigate rather than discharge her. A letter sent to plaintiff confirming her suspension for overstating hours corroborates Nold's statement that they all knew of the practice in the plant of overstating actual hours worked on the time cards. The relevant portion of the letter is as follows:

False documentation of any records is a serious violation of company policy and could have resulted in the termination of your employment. You did point out that you had been misinformed by other department employees. We have since taken appropriate steps to review our department position on the reporting of information as relating to hours worked, and record keeping with all our employees.

Dean stated he asked Nichelson if she knew the company policy regarding reporting overtime hours and that he did not know whether she understood him to be referring to the policy as Dean understood it or the practice followed by employees. Dean could not remember whether the nature of the policy was discussed with Nichelson.

Based on the credible evidence in the record, the Court finds that Dean, Smith and Nold must have known of the practice in the plant of employees overstating hours. The Court further concludes that Nichelson overstated her hours because she was following Johnson's example on how to record time on her card. The managers, Smith and Nold, either did not remember or could not recall whether Johnson's name was mentioned. Again, Nichelson's testimony is specific that she told Dean, Smith and Nold in that meeting she was following Johnson's example in explaining why she overstated hours. Dean testified he knew Johnson's name was not mentioned but he does not recall or cannot remember if the company policy on reporting straight time and overtime was explained to Nichelson or whether Nichelson was precisely asked why she overstated her hours.

Little investigation was conducted by Quaker Oats to ascertain whether other employees had committed the same offense. Instead, other employees benefited from Nichelson's suspension. Subsequent to Nichelson's suspension, meetings were held with employees to clear up misunderstandings employees had about reporting hours worked on their time cards. Apparently, no written report was made of any investigation. Even after Quaker Oats management discovered the misunderstanding about reporting straight time as well as overtime hours as stated to them by Nichelson, she was not afforded similar treatment given other employees. She was never paid for the two days.

It also puzzles this Court why, if the overstatement of hours was such a serious offense and this was the first occasion management could remember of an employee committing this serious offense, they could remember or recall so little concerning the content of their discussion with Nichelson. Nor could management personnel recall or remember when they held meetings to state the company policy or whether they asked or ascertained if other employees had overstated their work hours.

Nichelson certainly was not afforded the same treatment as two white employees, Ms. Patsy Alexander Reed and Ms. Frances Morris who were in a similar position. Ms. Reed testified that she and Ms. Morris were called into the office by Dale Smith for falsifying time sheets. When they denied the accusations, Smith told them to go back to work. Reed and Morris were never disciplined in any way. Nor did Smith conduct any meaningful investigation to verify their version of what happened that morning. He stated no investigation was warranted since they denied the charges and two other employees stated they arrived at work at the time they said.

Based upon all of the evidence in the record, and an analysis of that evidence, the Court finds the defendant discriminated against Nichelson, a black woman, when she was selected for punishment by suspension for two days for an alleged offense for which no other employee in the plant was punished because of her race and that defendant's articulated reason, falsifying time sheets, is a pretext and nothing more.

## QUALITY ASSURANCE SUPERVISOR

█ In October of 1980, after this suit was filed, Quaker Oats created two new

Quality Assurance Supervisor positions. Management posted notices of these new supervisory positions and urged all quality assurance employees, laboratory technicians and monitors to apply. Nichelson applied for one of the supervisory positions, but she did not receive the job.

Management selected Delores Jones, a black quality assurance monitor with a high school education, and Ms. Shirley Pounds, a white quality assurance monitor, with less than a high school education, for the positions of Quality Assurance Supervisors. Quaker Oats asserts the positions were recreated due to plant reorganization. The Quality Assurance Supervisor positions had been in existence in the early 1970's but had been eliminated in 1976.

Nold testified the Quality Assurance Supervisory position involved supervising the work of the quality assurance monitor. Knowledge of production work would also aid a Quality Assurance Supervisor in performing her job, according to Nold. The supervisor is primarily concerned with the process and weight control program. Additionally, Nold stated leadership capabilities and prior experience on the line were characteristics he sought in making his selections for the two supervisory positions. He admitted that experience as a quality assurance monitor was not an absolute requirement.

Nold also stated there were particular objectives established for a Quality Assurance Supervisor which are as follows:

1) Reporting relationships between the quality assurance supervisor and the quality assurance monitors:

2) Working with the laboratory manager to understand the computer weight system as it relates to process control:

3) Becoming familiar with the laboratory bench top methods/procedures both in analytical and microbiological:

4) Providing a framework to improve employee/supervisor relations and continue to develop continuity between shifts;

5) Working toward developing a system of reworking standard product to improve case accountability; and

6) Attending at least one seminar during the current year.

The Quality Assurance Supervisory position is described best as a general supervisory job to handle basic problems that occur on the off shifts when the majority of management is not there to handle such problems. The supervisors handle personnel problems such as sickness on the job and questions relating to policy and deal with situations regarding whether a product is substandard or not. Smith stated the one specialized thing a Quality Assurance Supervisor would have to know would be how to program a computer.

Nichelson has established a *prima facie* case that she was not promoted to the position of Quality Assurance Supervisor because of her race and in retaliation for having filed a charge against Quaker Oats with the EEOC and for having filed this lawsuit. *McDonnell Douglas* established the basic requirements to establish a *prima facie* case under Title VII and 42 U.S.C. § 1981. The *McDonnell Douglas* formula must be adjusted to cases of discriminatory refusal to promote. In establishing a *prima facie* case, Nichelson has shown that she belongs to a protected group; that she was qualified for and applied for a promotion; that she did not receive the promotion, and that another employee with similar qualifications received the job. Nichelson is a black female. The Quality Assurance Supervisor's job was offered to all quality assurance monitors and laboratory technicians. Nichelson was initially employed as a production worker and promoted to laboratory technician. *See Aikens v. U.S. Postal Service Bd. of Governors,* 665 F.2d 1057 (D.C. Cir.1981). She has three years of college education. Nichelson applied for the supervisory job which was created in 1980. She did not receive the promotion. Quaker Oats promoted Delores Jones and Shirley Pounds.

Quaker Oats attempted to make much of the fact that Ms. Jones is black and therefore asserted Nichelson has not established a *prima facie* case of racial discrimination on her failure to promote claim. The court in *DeLesstine v. Fort Wayne State Hosp., Etc.,* 682 F.2d 130 (7th Cir.1982), petition for certiorari filed September 22, 1982, rejected this same argument raised by the employer/defendant in that suit. This Court concurs with the rationale of that court and adopts it as its own in rejecting Quaker Oats' assertion that Nichelson has not established a *prima facie* case on this point. The court stated the following:

> That reasoning would foreclose a plaintiff from proving a *prima facie* case unless an employer discriminated not only against plaintiff but also against every so called protected minority by hiring a so called 'non-protected' person to fill the position. Appellants' argument defies the logic, purpose and language of Title VII.
>
> The reference to an employer seeking applicants from persons of "complainant's qualifications" in the (iv) element of the *McDonnell* model for establishment of a *prima facie* case, does not refer to the complainant's racial, ethnic, gender, religion, or national origin background. Title VII does not establish a class of protected minorities and non-protected others. (citation omitted) "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Cons. Corp. v. Waters,* 438 U.S. [567] at 579, 98 S.Ct. [2943] at 2951 [57 L.Ed.2d 957]. We hold that the reference to "complainant's qualifications" in the *McDonnell* model refers to a complainant's pertinent skills, talents, learning, training, and experience. The central focus of the inquiry in a Title VII case such as this is whether the employer is treating a plaintiff less favorably than others because of his race, color, religion, sex or national origin. *Id.* at 132, 133.

The establishment of a *prima facie* case merely raises an inference of racial discrimination. Quaker Oats articulated that Jones and Pounds were selected for the job primarily because they had more experience on the line. Nold, one of the supervisors who selected Jones and Pounds, stated at the time he made the selection he did not know that Nichelson had some experience on the line. If this was as important a criteria as Quaker Oats asserts, it puzzles this Court that the decision maker selected supervisors without ascertaining the qualifications of all applicants. As to the objectives established for a Quality Assurance Supervisor, the Court finds that a laboratory technician such as Nichelson was just as qualified as the applicants selected to meet the requirements and objectives of this general supervisory job.

Subjectivity in the selection of the supervisors is apparent from Nold's testimony:

Q. Now, Mr. Nold, what you actually did was that you just made a subjective decision about the two people that you wanted to appoint as quality assurance monitors [supervisors], isn't that correct?

A. Decisions based on experience.

Q. Based on their experience as perceived by you subjectively?

A. As perceived by me.

When it is considered that the major objective criteria, experience on the line, was not available to Nold when he made his selections, the Court is left with a decision based on primarily subjective criteria. Objective criteria is favored by the courts since subjective criteria may be an effective shield for discriminatory practices. *Rowe v. General Motors Corporation,* 457 F.2d 348 (5th Cir.1972); *Lee v. Conecuh County Bd. of Education,* 634 F.2d 959, 963 (5th Cir.1981); *Abrams v. Johnson,* 534 F.2d 1226 (6th Cir.1976). Subjective criteria may be a valid factor that an employer considers, but it should be combined with meaningfully applied objective criteria which indicates the selection was inherently fair. *Rowe* at 359; *See Nath v. General*

*Electric Co.,* 438 F.Supp. 213 (E.D.Pa. 1977), *aff'd,* 594 F.2d 855 (3rd Cir.1979); *Parson v. Kaiser Aluminum & Chemical Corp.,* 575 F.2d 1374, 1385–1386 (5th Cir. 1978); *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88 (6th Cir.1982). Any procedure employing subjective criteria will be carefully scrutinized to prevent abuse. *Id.* at 93.

■ Dean stated as personnel manager he considered experience, merit, education and personnel work performance important factors to consider in making a promotional decision. However, he also stated the company had no written, objective guidelines to aid management personnel in making promotional decisions. Dean said he participated in promotional decisions along with other management personnel. The management person or persons in the department where the promotion was to occur assisted Dean in the promotional decision. In this case, Dean, Smith and Nold selected the new Quality Assurance Supervisors. The procedures used by the management personnel permitted them to select for promotion those persons they desired based on unlawful criteria. The civil rights laws do not affect the employer's discretion to choose among equally qualified candidates, provided the decision is not based on unlawful criteria, *Burdine, supra.*

■ To prevail on a racial discrimination claim, alleging disparate treatment, the plaintiff must show by a preponderance of the evidence a discriminatory motive on the part of the defendant. Intentional discrimination may be proved by direct or circumstantial evidence. *Burdine, supra.* A showing of disparate treatment can be buttressed with evidence of a history of discrimination practiced by the employer, individual instances of discrimination, and evidence that the employer had the opportunity to discriminate. *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798 (5th Cir. 1982). Intent may be inferred by the Court assessing all the relevant facts and circumstances of this case. Proof of discriminatory motive can in some situations, "be inferred from the mere fact of indifference in

treatment." *Teamsters v. United States,* 431 U.S. 324 at 355, 97 S.Ct. 1843, 1864, 52 L.Ed.2d 396 (1977).

■ An incident which occurred after this suit was filed in January of 1982, revealed something of Smith's attitude toward black workers at the plant. Smith came into the kitchen area in the Quality Assurance Department where the employees drank coffee. When he entered the room, he saw Deborah Hale and Nichelson in the kitchen. Hale stated in substance the interchange which occurred between Smith and Nichelson as follows:

> We were in the kitchen of the lab. She (Nichelson) came in to get a cup of coffee. Dale Smith came in just a few minutes later. Vernice had gotten coffee, which was done by the employees. Dale Smith asked Nichelson didn't she have any work to do and she said she had just sat down. She told him it was no big deal and she got up and left and Smith went out behind her.

Hale said that Dale Smith seemed upset. She said that Smith did not say anything to her. When asked what her reaction was to Smith's attitude, Hale said:

> I was shocked. I could not believe it and stated that to Mrs. Nichelson.

After this lawsuit was filed, Nichelson was required to work overtime while she was sick while Patsy Reed and Myrtle Crider were not required to work overtime when sick. When Nichelson was asked in January of 1981 to work overtime she told Nold she was sick. Nold denied this. He testified that Delores Jones, Nichelson's supervisor, asked her to work overtime and plaintiff told her she did not have a babysitter. Nold stated he then told Nichelson she was the lowest on overtime and she would have to work. Nold did not recall whether Nichelson told him she was not feeling well. Nichelson worked overtime that night.

Reed stated that after the above incident, Delores Jones asked her to work overtime. Reed told Jones she was sick and that she was not going to work. Reed stated she

talked to Nold and told him she was sick and he told her "that you cannot make anyone work that is sick." Reed was not required to work overtime. Reed stated she knew at this time Nichelson had been required to work overtime when she was sick.

Further, Reed testified Nichelson became upset when she learned that Reed had not been made to work sick. Reed, Nichelson, Crider and Jones went to Nold's office to confirm what the policy was in regard to working overtime. Nold told all of them at that time an employee was not required to work overtime if he or she was sick. Nold testified it is his policy that if an employee is not feeling well he is required to work overtime but if he is sick and unable to work he is not required to work overtime. According to Nold, an employee would have to specifically tell him that he or she was unable to work overtime to be excused. Again, plaintiff, a black employee, was not afforded the same treatment as a white employee in a similar situation.

The record in this case is replete with testimony indicating a disturbing racial attitude in the Quaker Oats plant in Jackson. The evidence of racial prejudice is strong in this case. A black witness, Anna Cole, testified that she formerly worked at the Quaker Oats Company in Jackson. She stated that she resigned and left Quaker Oats after it was obvious to her that she would not be able to advance in that plant. She testified that Smith told her if she expected to advance she should seek employment with another company as he did not see anything for her until retirement. She also testified that Smith used racial slurs in her presence. She stated that when talking about the "Roots" television program Smith said "I'm just glad I don't have any niggers in my family." She also said Smith told her he did not want any blacks on his street because it would devalue his property. Rosa Benson corroborated Cole's testimony as to Smith's remark about not wanting any blacks on his street. Minnie Womack, a black employee, was suspended about the same time as Nichelson for leaving work without report-

ing to her immediate supervisor. However, Mrs. Womack stated she did tell a production supervisor she was leaving the plant because she was sick. The company officials who suspended Womack never made any effort to ascertain if Womack had indeed informed a plant supervisor she was leaving the plant.

After their suspensions, Nichelson and Womack approached Douglas Dean and asked him if he thought it was fair that two black women were suspended when all employees did the same thing. They testified he responded:

They had to start somewhere and make an example of someone. He said "think of it as a vacation." When asked why they started with two black women employees, he did not respond.

Based on the totality of the facts and the circumstances in this case the Court finds Nichelson has carried her burden by a preponderance of the evidence proving that Quaker Oats' refusal to promote her was racially motivated. The Court finds Quaker Oats' articulated reason is pretextual. *Burdine, supra; Long, supra.*

The Court also finds that Nichelson has established a *prima facie* case that Quaker Oats failed to promote her in retaliation for engaging in activities protected by Title VII. Quaker Oats knew a charge had been filed with the EEOC against it and that this lawsuit had been filed by plaintiff when it selected Jones and Pounds for the supervisory jobs. Nichelson was qualified for the job. The timing of Quaker Oats' action raises an inference of retaliatory actions. *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319 (S.D.Ohio 1978), *aff'd*, 628 F.2d 936 (6th Cir.1980).

Defendant's articulated reason for not promoting Nichelson to the Quality Assurance Supervisor's position is merely pretextual. Based on the totality of facts in this case and the entire web of circumstances presented, the Court finds the decision by Quaker Oats not to promote Nichelson was motivated substantially by her engaging in activities protected by Title VII. Jones and

Pounds had not filed a charge. *Sutton* at 1328. The facts found by the Court to establish a claim for racial discrimination are relevant to the establishment of a claim based on retaliatory motives.

## DEMOTION TO QUALITY ASSURANCE MONITOR

 In October, 1980, some six months after this suit was filed Nichelson was demoted from laboratory technician to the position of monitor on the floor where she remained until June, 1981. When Anna Cole resigned, Nichelson was reinstated as laboratory technician in replacement of Cole. Nichelson suffered no reduction in pay because of her demotion to the monitor position. Defendant asserts pursuant to a reorganization of the Quality Assurance Department, it was decided that the force in the laboratory should be reduced. Nichelson was transferred to the floor because she was the junior laboratory technician, with less seniority as a laboratory technician, according to Quaker Oats.

Nichelson was hired by defendant in August, 1976, as a production worker with three years of college. She was promoted to laboratory technician in May of 1977. Deborah Hale was hired as a laboratory technician with a tenth grade education on December 1, 1976. Anna Cole became a laboratory technician in 1972.

Dean and Nold testified the company policy is to reassign, or transfer the hourly employee with the least service in that job classification. It was stated the person with least seniority in a particular job classification would be the one laid-off if a decision was made to lay-off employees within a department. This asserted company policy has not been reduced to writing. There was no formalized established policy at the time plaintiff was assigned to the monitor position in 1980. Nor was there a collective bargaining agreement governing lay-offs or transfers. Nold stated someone in the personnel department relayed this asserted policy to him.

A white employee's job as a monitor was eliminated about this same time. Myrtle Crider was told she had to go to pizza, if not she would be terminated. Quaker Oats asserts this indicates whites received the same treatment as Nichelson in similar situations. It is indicated by Crider's testimony that she was a monitor who had been performing paperwork functions for a couple of years and that her job preparing paperwork was eliminated. There is no evidence that any other employee was performing this function. At the time of trial Crider was working in the laboratory but she testified she is still assigned to pizza.

The Court finds Quaker Oats' asserted policy that the junior employee in a particular job classification is the one selected for transfer if there is a reduction in force was used as a subterfuge in the case. Based on all the facts as found by this Court and considering the obvious racial turmoil in Quaker Oats' Jackson plant, Nichelson, the Court finds, was demoted to the monitor position because of her race and in retaliation for seeking to exercise rights provided to her by federal law.

 Additionally, Nichelson asserts Quaker Oats has violated her civil rights protected by 42 U.S.C. §§ 1985 and 1986 and the thirteenth and the fourteenth amendments. Nichelson has failed to establish that she is entitled to relief under any of the above provisions of law.

Title 42 U.S.C. § 1985 protects individuals from a conspiracy to interfere with their civil rights. Based on the evidence presented at trial, the Court finds that no conspiracy to interfere with Nichelson's civil rights was established. *Cameron v. Brock*, 473 F.2d 608 (6th Cir.1973). To have a claim under 42 U.S.C. § 1986, plaintiff must establish a claim under 42 U.S.C. § 1985. *Rogin v. Bensalem Township*, 616 F.2d 680 (3rd Cir.1980); *Dowsey v. Wilkins*, 467 F.2d 1022 (5th Cir.1972). Since Nichelson has failed to establish any right to relief under 42 U.S.C. § 1985, her claims under both 42 U.S.C. §§ 1985 and 1986 will be dismissed.

 Likewise, Nichelson's claim pursuant to the Thirteenth and Fourteenth

Amendments to the United States Constitution will be dismissed. The Fourteenth Amendment provides relief when an individual's civil rights have been violated as the result of significant state action. Neither the pleadings nor the proof established that Quaker Oats' conduct constituted state action. In the employment context, a claim cannot be sustained under the thirteenth amendment unless a plaintiff has no option to work elsewhere. *Pollock v. Williams*, 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944); *Tucker v. Harley Davidson Motor Co.*, 454 F.Supp. 738, 741 (E.D.Wis.1978); *Flood v. Kuhn*, 443 F.2d 264 (2nd Cir.1971), *aff'd*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Neither Nichelson's complaint nor the proof presented in this case established that she was forced to continue working for Quaker Oats.

The Court has asked itself, time and again, during the trial and while considering this case, why the Quaker Oats management, particularly Smith, would engage in such a systematic pattern of racially motivated conduct against Nichelson and other black women employees in the plant. To try and reach a rational answer, the Court considered the totality of all the facts and circumstances in this case. While the incidents cited in this case, if viewed as single incidents, appear to be marginal, the totality of all the circumstances, considered together, shows unmistakably that racial prejudice, racial discrimination and racially motivated conduct was pervasive in management decisions affecting Nichelson and other similarly situated black women employees. The Court finds from all of the proof the obvious purpose of this racially motivated conduct was (1) to somehow eliminate Nichelson from the plant work force and (2) to make an example of her as a warning to other black employees. She is black. She sought promotion. She filed an EEOC complaint against Quaker Oats. It just appears that from a racial perspective, she was a thorn in the side of management.

For all the reasons stated in this opinion, the Court concludes that Quaker Oats did treat Vernice Nichelson differently from other employees similarly situated because of her race and in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.

Once a violation of Title VII has been established, the Court has the power to order whatever equitable relief, including, but not limited to, reinstatement, back pay, costs and attorney's fees, as may be appropriate. § 706(g) of Title VII, 42 U.S.C. § 2000e-5(g).

 Accordingly the Court will enter an order providing relief as follows:

* 1. Immediate appointment of Vernice Nichelson to the position of Quality Assurance Supervisor. The appointment of Nichelson to that supervisory position shall not affect the two persons presently occupying that position. If immediate appointment is not feasible, then the Court awards in the alternative, front pay consisting of the difference between the pay of a Quality Assurance Supervisor and the pay now earned by plaintiff until such time as promotion to supervisor can be made. The record indicates at the time the Quality Assurance Supervisor position was recreated in 1980 the salary range consisted of a base amount of $1,589.00 per month and a maximum of $2,383.00 per month. Shirley Pounds' salary at the time of trial was $1,589.00 per month and Delores Jones' salary was $1,630.00. Mr. Dean indicated the salary range has increased somewhat.

* 2. The Court awards Vernice Nichelson back pay consisting of the difference between the pay of a Quality Assurance Supervisor and the pay earned by plaintiff since October, 1980, to place her in the position she would have been had Quaker Oats not violat-

---

* The financial information necessary to compute the sums due must be filed with the Court by

Quaker Oats within 20 days from the date of this order.

ed Title VII of the Civil Rights Act of 1964.

&ast; 3. Mrs. Nichelson is also awarded back pay for the two-day suspension she received in February of 1980.

4. Under 42 U.S.C. § 1981, a prevailing plaintiff can recover both compensatory and punitive damages. *Harris v. Richards Mfg. Co., Inc.*, 675 F.2d 811, 812 (6th Cir.1982). In reference to compensatory damages, plaintiff is entitled to damages for emotional distress, mental and physical pain, agony and embarrassment, which may be inferred from circumstances as well as proved by the testimony. *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Runyan v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Garner v. Giarrusso*, 571 F.2d 1330, 1333 (5th Cir. 1978).

5. Counsel for Nichelson will be awarded reasonable attorney fees to be taxed as part of the costs which are hereby adjudged against Quaker Oats. *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). Counsel for Nichelson will submit forthwith an Affidavit in support of his claim for said attorney fees. Defendants will respond within ten days and, if no agreement can be reached between the parties the matter will be resolved by the Court.

6. The Court will enter an Order permanently enjoining Quaker Oats from any further violation of Title VII of the Civil Rights Act of 1964, as amended, and requiring that notice of the injunction be posted promptly in the Jackson plant.

■ The Seventh Amendment guarantees a jury trial where a plaintiff is seeking legal relief, either compensatory or punitive damages, even though the right to such relief is created by federal statute. In an action brought under Title VII and 42 U.S.C. § 1981 both parties have a right to a jury trial on the legal claims under 42 U.S.C. § 1981. However, a party can be held to have waived his right to a jury trial if he does not timely demand a jury trial. Fed.R.Civ.P. 38(b). Plaintiff's legal claim under 42 U.S.C. § 1981 was first raised in the complaint. Both parties addressed and briefed the Section 1981 issue in the pre-trial and post-trial stages of this lawsuit. Quaker Oats was fully aware of Nichelson's Section 1981 claim from the inception of this suit but never demanded a jury trial. *Harris* at 815. Defendant waived its right to trial by jury on the Section 1981 claim.

■ Nichelson testified she was extremely humiliated and upset as a result of Quaker Oats' discriminatory conduct. There is substantial evidence in the record to support her assertions. Nichelson testified she cried when she was demoted and assigned to take temperatures on the floor for a week. Even Smith testified he observed plaintiff was upset by her claimed demotion and she told him she was embarrassed in the presence of other employees because she had been assigned to take temperatures on the floor. There is also evidence in the record that Nichelson was treated by her physician for nervousness suffered as a result of Quaker Oats' discriminatory conduct against her. Nichelson established injury for which she is entitled to compensation with evidence that she was embarrassed and humiliated by defendant's conduct. Vernice Nichelson is hereby awarded compensatory damages in the sum of $ 1,000.00 .

While the Court finds it borderline, Quaker Oats' conduct does not rise to that level of such malicious or willful conduct to sustain an award of punitive damages. *Claiborne v. Illinois Cent. R.R.*, 583 F.2d 143 (5th Cir.1978).

The primary reason for this conclusion is the Court was impressed during the trial of the appearance, demeanor and attitude of Mr. Charles Dunham, the Plant Manager of the Quaker Oats plant in Jackson. There is no evidence that he personally participated

in racially motivated conduct against Mrs. Nichelson or any other black person. In fact, the black women employees apparently turned to him for relief. The testimony is that he responded in a constructive way. For example, he reduced two indefinite suspensions to two-day suspensions. It appears to the Court that he sought to be a peacemaker when confronted by work place situations with racial implications. The Court finds that Mr. Dunham should be commended.

The Court directs Nichelson's attorney to prepare and present to the Court an appropriate order to be entered in this case within 30 days from the date of this opinion. The proposed order should first be presented to counsel for Quaker Oats.