Vernice C. NICHELSON,
Plaintiff-Appellee,

v.

QUAKER OATS COMPANY,
Defendant-Appellant.

No. 83–5746.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1984.
Decided Jan. 22, 1985.

J. Daniel Breen, Waldrop, Farmer, Breen & Bryant, Jackson, Tenn., Jeremy P. Sherman (Lead), argued, Seyfarth, Shaw, Fairweather & Geraldson, Michael A. Warner, Chicago, Ill., for defendant-appellant.

Avon N. Williams, Jr., Richard H. Dinkins (Lead), argued, Nashville, Tenn., for plaintiff-appellee.

Before MERRITT and KENNEDY, Circuit Judges and DeMASCIO, District Judge.*

MERRITT, Circuit Judge.

In this racial discrimination in employment case under Title VII of the 1964 Civil Rights Act and § 1981, Title 42, U.S.C., the District Court found in favor of plaintiff, one of approximately 500 employees of the

---

* The Honorable Robert E. DeMascio, Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.

defendant, Quaker Oats, at its Jackson, Tennessee, frozen food plant. The defendant presents assignments of error that the District Court made four clearly erroneous factual findings and four other trial errors on questions of law in its opinion reported at 573 F.Supp. 1209 (W.D.Tenn.1983). Because we resolve this case on the basis of the factual findings, we do not reach the defendant's assignments of error on questions of law. Here are the four factual findings made by the District Court which are at issue:

1. Defendant punished plaintiff by imposing a two day suspension and a one week change in work assignment for racially motivated reasons.

2. In retaliation for filing this lawsuit, defendant denied plaintiff a promotion to one of two supervisory positions, one of which was given to another black woman and the other to a white woman.

3. Defendant made a retaliatory transfer of plaintiff to another job assignment and used as a pretext for this transfer the excuse that it was simply transferring the least senior employee during a period of staff reduction.

4. Plaintiff's counsel is entitled to attorney's fees in the amount of $20,976.00 based on an hourly rate of $120.00, and $5,244.00 based on a 25% contingency factor.

### I.

Plaintiff's claims require a rather lengthy discussion of the facts. The parties agree on the following facts:

1. The conduct in question occurred in a Quaker Oats plant that makes some 30 different frozen food products including pancakes, waffles and various frozen pizzas. The plant has several different departments including the production floor where the frozen food products are made, the shipping department, the personnel department and the quality assurance department. Plaintiff was employed by defendant on the production floor in August, 1976, and was promoted the next year to the position of laboratory technician testing food samples in the quality assurance department. Dale Smith was the manager of the quality assurance department during the period in question.

2. During the first two weeks in January, 1980, plaintiff was participating in a microbiological or bacteria testing training program. On Friday, January 11, 1980, she left work before her shift was over to attend court in a case unconnected with this case. When she left work on that day, she left a part of her bacteria testing work uncompleted on a table in the laboratory. On the following Monday, Smith reassigned her for the week, without a change in pay, to work on a project on the production floor testing the temperature of waffles. The District Court found that this move was prompted by racial considerations.

3. Plaintiff received overtime pay for work on weekends during January and February, 1980. On Saturday, February 16, 1980, she worked not more than six hours but incorrectly entered eight hours on her pay time card. For this incorrect entry, the defendant suspended her for two days without pay. The District Court found this action was racially motivated.

4. In October, 1980, the company reorganized the quality assurance department. It created two quality assurance supervisor positions. All quality assurance employees, ten of whom were white and six of whom were black, were invited to apply for the two newly created supervisory positions. The jobs entailed supervision of quality assurance food monitors. Plaintiff had not had experience as a monitor. The company gave the jobs to two former monitors, one black and the other white.

5. In October, 1980, as part of its departmental reorganization, the defendant introduced a pasteurizer in the quality assurance laboratory which reduced the number of hours of microbiological analysis by lab technicians. The defendant reduced the number of such jobs from three to two. Plaintiff, the least senior laboratory technician at the time, was transferred to the

position of quality assurance monitor at no reduction in pay. The defendant reassigned her to the position of quality assurance technician in June, 1981, when a more senior technician resigned.

## II.

We are aware that employment discrimination based on race can occur both in subtle and obvious ways, both of which are contrary to the equal opportunity goals set out by Congress in Title VII, 42 U.S.C. § 2000e *et seq.* We are also aware that subtle forms of discrimination may be difficult to prove, but the burden of proof is on the plaintiff to prove that it is more probable than not that he or she was discriminated against on the proscribed basis. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff has the burden both of establishing the inference of discrimination and of proving that any asserted legitimate non-discriminatory motive of the defendant is pretextual. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The allocation of burdens of proof may often determine the outcome of a case.

We are constrained on appellate review to reverse a district court's holding if it is clearly erroneous. A clearly erroneous holding is one not supported by the record on which the holding is based. The record in this case does not contain evidence to support finding that plaintiff proved the claims outlined above by a preponderance of the evidence. Accordingly, we must reverse the holding of the District Court.

### A. January, 1980, Work Reassignment

The District Court discussed plaintiff's one week reassignment to production floor food testing in January, 1980, in its opinion at 573 F.Supp. 1215–21. The Court concluded that plaintiff's reassignment was a form of discipline for leaving microbiological testing work uncompleted on Friday, January 11, 1980, and over the weekend; that Smith, the department manager, was angry at her on the following Monday; and that the disciplinary measure was racially

motivated because Smith did not become angry at or discipline another white laboratory technician, Ms. Hale, who did not finish the microbiological testing work for plaintiff on that Friday or over the weekend.

We accept the finding that Smith was angry on Monday and that he did not discipline Hale, the white employee. But the proof clearly shows that Smith was a temperamental rather than a mild mannered manager who showed anger often and that he directed his anger at both white and black employees when he thought they were not working up to par. We do not see that any racial motivation for the reassignment can be inferred from Smith's treatment of Ms. Hale. She was not assigned to taking temperatures on the floor when this incident occurred because she did not leave any of her own work unfinished on the Friday that plaintiff was absent. She testified that she did not know that plaintiff wanted her to finish the microbiological testing when plaintiff left early, and plaintiff herself testified that she thought she would be able to come back and finish the work on Friday.

Most significant, Hale contacted Smith for express permission to leave particular work undone when she came to the lab on Saturday. Smith gave her permission to do this.

We agree with the District Court that plaintiff's reassignment—without any loss of pay—was a disciplinary measure. There must be evidence, however, to support the inference that the punitive action was racially motivated. A disciplinary measure against a black or a woman or other protected individual does not in itself justify a finding that it is wrongfully motivated. In what is essentially a claim of disparate punishment, as here, plaintiff must introduce evidence to show that similarly situated white employees were not punished for workplace mistakes or oversights similar to that committed by plaintiff, that is, leaving work undone without giving timely notification that the work

would be undone or getting prior permission to do so. The District Court does not point to any evidence that would justify an inference of disparate treatment based on race; we have searched the record and have found no such evidence. We must conclude, therefore, that the finding cannot be sustained.

### B. The February, 1980, two day suspension

The District Court at 573 F.Supp. 1221–24 finds that plaintiff's two day suspension for exaggerating the overtime hours she worked on Saturday, February 16, 1980, was based on race (a) because she was simply following a pattern of exaggerating overtime that she and Johnson, another employee, had followed on January 5, a Saturday several weeks earlier, when they worked together; (b) because there was confusion in the plant about whether exaggerating eight hours overtime on Saturdays was permissible; (c) because Rosa Benson testified "that Smith instructed her, prior to Nichelson's suspension, to report eight hours on weekends regardless of the time she actually worked," 573 F.Supp. 1223; and (d) because two white employees, Reed and Morris, were caught exaggerating their time and were not disciplined.

The finding concerning Johnson on January 5 is in error. Johnson did tell plaintiff that he put down eight hours for that day, but he testified that he was an exempt employee who did not receive overtime pay and that he did in fact work eight hours on January 5, when plaintiff left earlier. Johnson's unequivocal denial that he exaggerated his hours is a sufficient non-race-based reason for the company to treat the case of Johnson and plaintiff differently.

On the question of confusion in the plant about overtime pay, a close review of the record indicates (a) that the custom was for employees to be paid for four hours on Saturday even if they worked less, but (b) that no custom existed allowing eight hours when employees worked less. Both black and white employees so testified, with one exception. Rosa Benson's testimony on this subject is equivocal. She testified both ways:

Q. (by Mr. Williams). Well, what would be the situation if you did not actually work eight hours on a Saturday?

A. We would put down the actual hours, seven hours, or six, or whatever, but that would be overtime hours.

Transcript, pp. 1256–57.

Rosa Benson repeated this testimony on cross examination:

Q. Mrs. Benson, if you worked seven hours on a Saturday overtime, how many hours do you put down on your time sheet?

A. Forty-seven.

Q. Forty for the week plus seven?

A. Right.

Q. If you worked seven hours on a Saturday and the plant was running on Saturday as well, but you only worked seven hours, how many hours would you put down on your time sheet?

A. I would put down forty-seven.

. . . .

Q. And that was true even at the time that Mrs. Nichelson was suspended, wasn't it?

A. Yes.

Transcript, pp. 1264–65.

Then upon redirect by plaintiff's counsel, she testified:

A. Yes. Before Mrs. Nichelson was suspended, there have been times that if you worked six hours and went home, we would still put down eight hours.

Q. Even on Saturday when the plant was running?

A. Yes.

Q. But it was clarified after Mrs. Nichelson was suspended? Is that what you are saying?

A. Yes. After Mrs. Nichelson and Mrs. Womack, it was clarified that you

put down your actual hours that you worked.

Transcript, p. 1266.

Upon recross by defense counsel, Benson reiterated:

Q. But you knew even before Mrs. Nichelson was suspended that if you worked six hours on a Saturday and that's all you worked, you put down six hours, didn't you?

A. No. We put down eight hours. All of us did.

Q. Even if you worked overtime?

A. Even if we worked overtime. All of us did.

Transcript, p. 1277.

When a witness makes two directly opposite statements with equal certainty, it is difficult to see how the testimony can be viewed as authoritative for either proposition. Further, Rosa Benson did not testify, as the District Court found, that Smith told her to put down eight hours overtime on weekends if she had worked less. We have read and reread her testimony on this finding, and we can locate no such testimony by her. In fact, her testimony is directly contrary to the District Court's finding. She testified as follows:

Q. Why did you fill out the time sheet with the full eight hours for all five days even though you knew she had left sometime around 8:00 o'clock on Friday?

A. We had a meeting once before on a Saturday, and Dale Smith had told us no matter how many hours we worked *during the week*, we were to put down 40 hours, because we would get paid for it anyway. But if we had worked *any overtime*, that we put down our actual overtime hours that we worked.

Transcript, p. 1255 (emphasis added).

The finding that Reed and Morris were similarly situated white employees whom management treated differently is also in error. Both testified that Smith accused them of exaggerating their hours but that they proved they were working when they said they were working and that they did not exaggerate their hours. They produced two supervisors, one black and the other white, who corroborated their testimony for Smith. This evidence distinguishes plaintiff's case from their cases and shows that Reed and Morris were not similarly situated to plaintiff; it provides a sufficient non-racial basis for the company's conduct in declining to punish Reed and Morris.

■ Thus, again we are constrained to reverse the District Court's findings that plaintiff was suspended for two days in February, 1980, because she is black. The court's specific findings are mistaken, and no testimony or evidence cited in the District Court's opinion respecting this suspension would justify a finding of racial discrimination.

## C. Failure to Promote Plaintiff to Quality Assurance Supervisor

■ The District Court's findings that the defendant did not promote plaintiff to the position of quality assurance supervisor because of her race is likewise clearly erroneous. Two supervisory jobs were created in October, 1980, six months after this suit was filed, and almost all of the 16 employees in the department, six of whom were black, applied. One black and one white were promoted. It is undisputed that the supervisor's job was to oversee the work of the quality assurance monitors on the floor, and the company gave great weight in making the promotions to prior experience as monitors. It is undisputed that the plaintiff had no such experience at that time. The undisputed testimony of Mr. Gregory Nold concerning the company's reasons for selecting Mrs. Jones, a black, and Mrs. Pounds, a white, rather than plaintiff Nichelson, was as follows:

Q. (By Mr. Sherman.) Whom did you select?

A. Mrs. Delores Jones and Mrs. Shirley Pounds.

Q. What was the reason you selected those?

A. Chiefly, the reason was their prior experience on the line, their experience with QA monitoring. Other things that I looked for was initiative, aggressiveness, leadership qualities....

Q. How did you rate Mrs. Jones' and Mrs. Pounds' qualifications viz a viz Ms. Cole and Ms. Nichelson?

A. Chiefly, as I mentioned before, their jobs—The main thing that I looked for in filling the positions was experience on the line. I was pleased with the amount of time they had on that particular job, and they were familiar enough with the packaging and the process control. They knew production employees. They knew operators. They knew most of the line people down there.

Q. What was the reason they knew this? Why were they familiar with production operators and line operators?

A. Because they had worked as a QA monitor.

Q. At this time, had Mrs. Nichelson had any experience as a QA monitor?

A. Not that I am familiar with, no.

Transcript, p. 1047–48.

This testimony clearly provides a nonpretextual reason for promoting Jones and Pounds rather than plaintiff, and the District Court was not justified in finding from this testimony that Nold made his selections "without ascertaining the qualifications of all the applicants." 573 F.Supp. at 1226.

## D. Demotion to Quality Assurance Monitor

In October, 1980, six months after this suit was filed, plaintiff was reassigned from laboratory technician to the position of monitor on the production floor where she remained until June, 1981, at no reduction in pay. The District Court's finding of racial discrimination in connection with this transfer is as follows:

The Court finds Quaker Oats' asserted policy that the junior employee in a particular job classification is the one selected for transfer if there is a reduction in force was used as a subterfuge in the case. Based on all the facts as found by this court and considering the obvious racial turmoil in Quaker Oats' Jackson plant, Nichelson, the court finds, was demoted to the monitor position because of her race and in retaliation for seeking to exercise rights provided to her by federal law.

573 F.Supp. at 1229.

■ The evidence is undisputed, however, that the staff reduction itself was appropriate because new, more efficient machinery was installed which reduced the hours necessary for lab technician work. It is also undisputed that the company had a policy of transferring or laying off the junior member of a department in case of staff reduction. It is also undisputed that plaintiff was the junior member and was restored to her old job as soon as the next employee above her resigned. The court attributes subterfuge to the company apparently because the company's stated seniority policy was not reduced to writing. No evidence was adduced to disprove the company's seniority-based transfer policy. When an objective and widely-applicable employment practice such as a seniority system is at issue, the court's finding that it is pretextual should rely on evidence in the record more substantial than the lack of any formalized writing. A few months after the assignment to the floor, the company reassigned plaintiff to her old position when a more senior technician resigned. Both the assignment to the floor and the reassignment to the lab were based on seniority, a neutral, permissible, nonracial basis.

In view of our conclusions that the findings of liability based on racial discrimination are unsupported in the record and therefore clearly erroneous, the judgment of the District Court is reversed.

### E. Use of a Racial Slur

Several years before the events in question in this case, Dale Smith, the manager of the department in question, made a racial slur, as follows:

Q. Would you tell me [Mr. Smith] the context of that statement?

A. This statement was made the first working day after the completion of the first showing of "Roots" on television, and Deborah Hale and Anna Cole and Mary Wondolowski were in the kitchen area when I walked in that morning to get my cup of coffee. As I turned around, from getting the cup of coffee, Anna said to me, "Your ancestors"—they were talking about the 'Roots' program—and she said, "your ancestors were very cruel to us."

And she seemed at that point to be very pleasant in her comment, and I didn't see anything unusual about that and I, in a very feeble attempt to make a joke, tried to quote a statement that I had heard, because I had watched the show, too, something [quoted in 'Roots'] to the effect, "but my ancestors weren't niggers." Immediately as soon as that left my mouth, I realized that I should not have said it, and she became very upset. I can understand why she would. She was very upset, and it hurt me that I had said it, and that she was so upset, and so I immediately tried to apologize to her, and I went over to her, and she pushed me away, and she wouldn't accept my apology. She then got up and left the room, and I followed her trying to apologize, and she wouldn't accept it.

Q. Did you ever make any other attempts to apologize to her?

A. That bothered me a lot for several months, and I attempted to apologize, and I really don't believe she ever did forgive me for it.

Transcript, pp. 1136–37.

■ Plaintiff strongly asserts that this reference justifies the District Court's findings of racial discrimination toward plaintiff, who was not present when this conversation took place. We find no linkage or causative effect between this statement made several years earlier and the plaintiff's specific claims against the company in this case. Unfortunately, racial slurs occur among the members of many races. The destructive effect of racial slurs on our society cannot be underestimated, particularly when the statements are directed toward a member of a minority race by one of a majority. But such speech is not normally actionable unless it is connected in a cause and effect relationship with conduct that is unlawful. The conduct in the instant case of which the plaintiff complains has not been shown to be based on considerations other than legitimate, nonracial employment criteria, and one unconnected racial comment remote in time and circumstance does not convert the case into one of racial discrimination in employment.

■ Accordingly, the findings of liability made by the District Court are reversed and the attorney's fees awarded plaintiff as the prevailing party under 42 U.S.C. § 1988 are set aside.