927 F.2d 604
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gertrude KETRON, Plaintiff-Appellee,
v.
UNIVERSITY OF KENTUCKY, Defendant-Appellant.
 No. 89-6590.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Kentucky, No. 86-00281; Harton, C.J.
 E.D.Ky.
 REVERSED.
 Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant-appellant, the University of Kentucky ("UK" or the "University"), appeals from the July 21, 1989, judgment in favor of plaintiff-appellee, Gertrude Ketron ("Ketron"), and the November 20, 1989, order awarding Ketron attorneys' fees. Ketron, a security worker at the University, alleged that she had been the victim of unlawful sex discrimination with respect to the terms, compensation, privileges and conditions of her employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq.[1] Ketron claimed that the University imposed different working conditions and advancement opportunities upon her than were imposed upon similarly situated male employees. Ketron further alleged that in retaliation for filing sex discrimination charges against the University, she was unlawfully terminated. For the reasons set forth below, we REVERSE.
 
 I.
 A.
 
 2
 The University employed Ketron on March 4, 1980, in its Division of Public Safety as a temporary part-time traffic control attendant. When Ketron accepted the position, her supervisor, Ed Newell, allegedly informed her that there were no full-time jobs available. In April 1980, Ketron applied for a full-time position, but she was not selected.
 
 
 3
 On December 18, 1981, Ketron filed a complaint of sex discrimination with the Lexington-Fayette Urban County Human Rights Commission ("HRC") alleging that she had been improperly denied a full-time position with the University's Division of Public Safety. On August 16, 1982, the parties entered into a negotiated settlement agreement. The settlement agreement provided, in pertinent part:
 
 
 4
 NOW THEREFORE, in consideration of the promises contained herein, the parties hereto agree as follows:
 
 
 5
 1. The [University] agrees to establish a regular half-time position and to place [Ketron] in this position.
 
 
 6
 2. The [University] agrees to give [Ketron] priority for the next vacancy for which she is qualified as a regular full-time security worker I in the department of public safety,[2] or
 
 
 7
 3. [The University] agrees to notify the Lexington-Fayette County Human Rights Commission of the next vacancy for a regular full-time security worker I.
 
 
 8
 4. The [University] agrees to pay to complainant an amount of money equal to the difference in the wage for a regular and temporary security worker for the period June 27, 1981 to January 7, 1982 (623.5 hours at $4.11 = $2,562.59 minus 6234.5 hours at $3.25 = $2,088.73 paid; a total of $473.86 less taxes and FICA). [The University] agrees to permit Mrs. Ketron or her authorized agent to inspect the payroll records which constitute the basis for this calculation, subject to the condition that proper advance arrangements are made.
 
 
 9
 5. The [University] agrees to award vacation, holiday, sick leave credit to [Ketron] from the period July 1, 1981 to [August 13, 1982].
 
 
 10
 6. The [University] agrees to permit [Ketron] to enroll in any and all Blue Cross-Blue Shield medical insurance and any other group insurance for which she is eligible to participate as a regular, half-time employee in the [University's] group insurance programs.
 
 
 11
 7. [Ketron] agrees to request the EEOC and the Commission to dismiss or withdraw the charges she filed with each agency....
 
 
 12
 11. It is understood that this agreement does not constitute an admission by the [University] of any violation of Ordinance 5672, Fayette County Fiscal Court Resolution of October 18, 1966, Chapter 344 of the Kentucky Revised Statutes, or Title VII of the Civil Rights Act of 1964.
 
 
 13
 Addendum 1 of Appellee's Brief (Negotiated Settlement).
 
 
 14
 Pursuant to the settlement agreement, Ketron applied for and received the position of full-time security worker I on November 30, 1982. Her duties included working at the front door of the University's Medical Center from 8:30 a.m. to 4:00 p.m., providing directions and assistance to patients and visitors, enforcing parking regulations, and providing relief, if necessary, for parking lot attendants. The job description indicated that parking would be a minimal part of the job's requirements, however, the Assistant Director of the UK Medical Center indicated that the job involved thirty to forty percent of the time in parking and traffic control.
 
 
 15
 Disputes arose regarding Ketron's temperament and job performance. Less than two weeks after Ketron started this job, she was reprimanded for a "bad attitude" and on January 12, 1983, after working only thirteen days at an assignment on the front door of the UK Medical Center, Ketron was moved from the front door assignment to an assignment that required her to work approximately 19.5 hours per week in the parking booth and 18 hours per week as a security guard.
 
 
 16
 Ketron filed a second complaint with the HRC against the University on February 17, 1983, alleging that the University had breached the settlement agreement and was retaliating against her for filing the December 18, 1981 complaint. The University's affirmative action officer, Nancy Ray, received the charge on March 7, 1983; but Ketron's supervisors were not informed of the charge at that time. On March 29, 1984, after investigating the second complaint which was filed the previous year, the HRC determined that there was probable cause to conclude that Ketron's assignment to parking duties on a continuing basis breached the 1982 settlement agreement and constituted continued harassment and retaliation.
 
 
 17
 Mason Sexton, Ketron's supervisor, had no knowledge of the second charge of discrimination filed on February 17, 1983, when he prepared Ketron's formal performance appraisal in which he recommended Ketron's termination. Peggy McClintock ("McClintock"), one of Sexton's superiors, did not agree with Sexton's recommendation to terminate Ketron. McClintock instructed Sexton to provide Ketron with additional training. On March 10, 1983, Sexton placed Ketron on an extended ninety-day probation. On March 28, 1983, Ketron began working approximately half of her time patrolling the halls and lobbies and half of her time in the parking booth collecting parking receipts. Ketron's probation ended on June 20, 1983, with the caution that she should continue to exercise good judgment and exhibit a proper attitude on the job.
 
 
 18
 Ketron and Jessie Offutt ("Offutt"), a male employee, were the only two individuals working full-time security on the day shift. Offutt performed the same duties as Ketron, but on different days of the week. They divided the parking and security duties on the first shift for the Medical Center.[3] The other male members of the security force--Charles Webb, Frederick Pophin, Fred Dowell and Robert Ketron who was Ketron's husband--were night shift employees. Since the night shift does not have parking duties, these men did not have to work in the parking booth. Appellant's brief raises some ambiguity on this issue in stating: "Webb and another night shift security worker, Fred Dowell, performed some parking duties for several hours at a time, but generally did not because the parking lots were closed during most of their work schedules on the night shift." Appellant's Brief at 9.
 
 
 19
 On March 18, 1984, Paul Dillon ("Dillon")[4] replaced Sexton as the Director of the Medical Center's Security and Parking Department. On the same day, Ketron sustained a work-related injury when the door of the parking booth fell on her. She was unable to work the remainder of the day and was taken to Humana Hospital on March 19, 1984. Pursuant to her doctor's instructions, Ketron remained on sick leave. On April 5, 1984, Dr. Sweeney, Ketron's attending physician, reported that Ketron would be able to return to work on April 9, 1984. He further indicated, "No prolonged sitting. No prolonged standing. [Ketron] should remain on light duty work until further notice." Addendum 4 of Appellee's Brief. On April 30, 1984, Dr. Sweeney wrote: "Mrs. Ketron is markedly improved. She has some back ache. She thinks she can handle security very well but will not be able to sit in a guard booth. I will keep [her] at the security job for the next couple of months and see her again at that time." Id.
 
 
 20
 Ketron's medical report was shared with Dillon. When she returned to work, Ketron learned that her former supervisor, Mason Sexton, had been replaced by Dillon. He informed Ketron, who was unable to fulfill her parking duties, to return home if her health problems prevented her from working the parking assignment. Dillon then permitted Ketron to substitute for her husband while he was on vacation. Ketron's husband's security job was on the night shift; consequently, it did not involve any parking duties. Between April 9 and April 18, 1984, Ketron worked her husband's shift.
 
 
 21
 After completing her husband's assignment, Ketron took a two-week vacation and reported to work on May 6, 1984. Again she was unable to fulfill her parking booth duties because she claimed that long periods of sitting aggravated her back injury. Dillon told Ketron not to return to work until she could work in the parking booth. Ketron exhausted her sick leave and was then placed on leave without pay.
 
 
 22
 On May 24, 1984, Ketron was examined by another physician, Dr. T. Rothrock Miller, who reported:
 
 
 23
 As can be seen, at the time of my examination, there is evidence of some degenerative disease in the lower back, which of course is of quite long standing. At this point, I would not place any specific restrictions on her work as a security officer. With a degenerative disease such as she has, if she is required to sit for long periods, it will be necessary to get up and stir about on occasion, which I would think would be quite possible if one is assigned to a parking lot. I doubt if her overall functional impairment is much greater than one would reasonably expect in any woman of her age.
 
 
 24
 Defendant's exhibit 18. Dillon received a copy of Dr. Miller's report.
 
 
 25
 On June 1, 1984, Dillon hand-delivered a letter to Ketron at her home, directing her to return to work on June 3, 1984. Ketron attempted to work in the parking booth for 6.5 hours but was unable to complete her assignment because of back pain. On June 10, 1984, at Dillon's direction, Ketron tried again to work in the parking booth. This time Ketron was only able to work three hours in the parking booth before having to return home because of back pain. Dillon informed Ketron on June 11, 1984, not to return to work until she was able to perform her parking duties. On June 12, 1984, Ketron reported to work and Dillon informed her that she was terminated. The employee separation sheet indicated that Ketron was discharged because of "excessive absenteeism." Addendum 6 of Appellee's Brief. "Ms. Ketron was terminated because of failure to work on a regular basis which has not allowed her to accomplish the assigned duties of her position." Id. The evaluation section of the employee separation sheet indicated the following: Ketron's quality of work was fair; her quantity of work was unsatisfactory; her conduct was fair; her cooperation was poor; her personality was fair; and her reliability was unsatisfactory. Id.
 
 B.
 
 26
 A bench trial was conducted on December 7-9, 1988. The district court entered its memorandum and order granting judgment to Ketron on May 22, 1989. On July 21, 1989, the district court entered its final judgment, ordering the University to reinstate Ketron to her previously held position of security worker I and to pay Ketron $49,621.58 for lost wages and other employment benefits through December 9, 1988. In addition, Ketron was awarded lost wages, calculated at the rate of $5.32 per hour, for the period after December 9, 1988. The judgment also ordered Ketron to recover reasonable attorneys' fees and costs.
 
 
 27
 On July 31, 1989, the University filed motions for a new trial, to amend and alter the findings of facts and conclusions of law, and for involuntary dismissal. The district court denied these motions on November 20, 1989.
 
 
 28
 On July 25, 1989, Ketron petitioned the court for attorneys' fees and submitted a memorandum in support of such petition. Ketron did not submit an affidavit of her counsel's normal billing rates, nor evidence of market rates for the services of her attorneys. The University opposed the motion and requested a hearing. In its November 20, 1989, order, the district court granted Ketron's motion for the amount of attorneys' fees and costs requested. The district court resolved the factual disputes without conducting a hearing and adopted Ketron's brief supporting the motion as its findings of fact and conclusions of law on the attorneys' fees issue.
 
 
 29
 On December 14, 1989, the University filed a timely notice of appeal from the July 21, 1989, judgment in favor of Ketron and the November 20, 1989, order granting attorneys' fees.
 
 II.
 
 30
 The University assigns various errors on appeal. First, the University argues that the district court made several erroneous findings of fact in concluding that the University discriminated against Ketron in the terms and conditions of her employment and retaliated against her for filing complaints with the HRC. Next, the University maintains that the district court erred in permitting HRC investigators to testify at trial and relying so heavily upon their findings and conclusions. Finally, the University contends that the district court erred in its award of attorneys' fees to Ketron.
 
 A.
 
 31
 The district court held that UK treated Ketron "differently from the way it treated similarly situated male employees because of her sex." Joint Appendix at 234. From our review of the record, we conclude that Ketron has not satisfied her burden of establishing that she was discriminated against in the terms and conditions of her employment. Accordingly, we reverse the district court's judgment.
 
 
 32
 Where a Title VII claim is brought under a disparate treatment theory, the plaintiff must prove discriminatory intent. See Grano v. Dept. of Dev. of City of Columbus, 637 F.2d 1073, 1081 (6th Cir.1980). Discriminatory intent may be proved by direct or circumstantial evidence. Id. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), establishes the following allocation of evidentiary burdens: (1) the plaintiff must establish a prima facie case of discriminatory treatment; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action; and (3) the plaintiff must establish by a preponderance of the evidence that the employer's reason is merely a pretext. Id. at 802-04; see also Burdine, 450 U.S. at 250, 252-53. Thus "[t]he plaintiff has the burden of establishing the inference of discrimination and of proving that any asserted legitimate non-discriminatory motive of the defendant is pretextual." Nichelson v. Quaker Oats Co., 752 F.2d 1153, 1157 (6th Cir.1985) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)).
 
 
 33
 To establish a prima facie case under a disparate treatment sex discrimination theory, the plaintiff must establish by a preponderance of the evidence that she belongs to a protected class and she was treated differently than similarly situated male employees under circumstances which give rise to an inference of unlawful treatment. Burdine, 450 U.S. at 253, 258; see also Grano, 637 F.2d at 1079. The purpose of the prima facie case requirement is to "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejections." Burdine, 450 U.S. at 254. To establish that the nondiscriminatory reason articulated by the employer is merely pretextual, the plaintiff may either persuade the court that the employer was more likely motivated by a discriminatory reason or the "employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.
 
 
 34
 A district court's findings of fact are not disturbed unless they are found to be clearly erroneous. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 35
 In determining that UK discriminated against Ketron under a disparate treatment theory, the district court found that one of the dispositive issues in this law suit is whether the University breached the settlement agreement. The district court found that Ketron received some of the benefits guaranteed in the settlement agreement, but found "scant evidence to indicate that the University made a good faith effort to implement the agreement." Joint Appendix at 244. The record does not support the district court's finding that the settlement agreement was not fully implemented. In compliance with the terms of the settlement agreement, Ketron received a half-time security position. She was given priority for and subsequently filled the first vacancy for a full-time position of security worker I. Ketron continued to work in this position until she was terminated. The University paid Ketron the requisite wage differential and awarded her vacation, holiday and sick leave retroactively. In addition, the University permitted Ketron to enroll in its group insurance programs. Our review indicates that there is considerable evidence that the University complied with the settlement agreement. While there was testimony indicating that the settlement agreement required Ketron to have a position with fewer parking duties than the fifty percent parking duties that Ketron's job entailed, the settlement agreement is silent on this issue. Moreover, the record does not indicate that Ketron applied for a position as a night shift security worker which, by virtue of the fact that the parking lots are closed at night, entailed little if any parking duties. The record, when taken as a whole, contradicts Ketron's allegation that the University breached the settlement agreement. On these facts, we find the district court's reliance upon the alleged breach to find that the University discriminated against Ketron in the terms and conditions of her employment to be clearly erroneous.
 
 
 36
 The district court also determined that the University treated Ketron differently from male security workers. To support this finding, the district court relied on the following evidence. Fred Dowell, a male security worker, only worked two to three hours in the parking booth. Charles Webb had minimal parking duties. Frederick Pophin testified that Ketron worked under more restrictions than males holding the position of security worker I. For example, Ketron had to be at the medical center earlier than the male security guards and she had more restrictions on where she could go at the UK Medical Center complex. Based on this testimony, the district court concluded that Ketron was the victim of unlawful disparate treatment.
 
 
 37
 In comparing the male and female security workers, the district court failed to compare similarly situated employees. In considering the alleged disparate treatment between male and female employees, the district court failed to consider Fred Dowell and Charles Webb had fewer parking duties than Ketron because they worked on the night shift when parking lots were not in use and, therefore, not staffed. The district court's failure to compare similarly situated employees was error.
 
 
 38
 Because parking booth duties were not included in the duties of the night shift employees, a finding that Ketron, a day shift employee, and any of the night shift employees are similarly situated is clearly erroneous. Jessie Offutt, a male day shift security I employee, was similarly situated to Ketron. He performed the same parking and security duties as Ketron. There is no evidence that Ketron was treated differently than Offutt because of her sex. That Ketron and Offutt performed identical duties prevents Ketron from establishing a prima facie case of discriminatory treatment in the terms and conditions of employment. Indeed, only male employees worked the night shift which required little or no parking duties. However, Ketron did not indicate that she applied for a position on the night shift and that an equally qualified male applicant received the position in spite of her priority under the settlement agreement. Thus the district court's analysis of the different treatment of male and female employees is not persuasive. Our review of the record indicates that Ketron failed to establish a prima facie case of sex discrimination.
 
 B.
 
 39
 The district court held that UK fired Ketron in retaliation for filing civil rights charges. Id. The district court found UK's reason for terminating Ketron--excessive absenteeism--to be pretextual. These findings are unsupported by the evidence and, therefore, clearly erroneous. After careful review, we conclude that Ketron has not satisfied her burden of establishing that she was terminated in retaliation for filing Title VII charges. We, therefore, reverse the district court's judgment.
 
 
 40
 To establish a prima facie claim of retaliatory treatment, the plaintiff must show: (1) that she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) that she was subject to adverse employment actions subsequent to or contemporaneous with her protected activity; and (3) that there is a causal connection between the protected activity and the adverse employment action. Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir.), cert. denied, 111 S.Ct. 516 (1990); Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50, 54 (6th Cir.), cert. denied, 478 U.S. 1006 (1986). If the plaintiff succeeds in establishing a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason. The plaintiff will prevail if she proves that the explanation is pretextual.
 
 
 41
 The district court's analysis of Ketron's retaliatory termination claim fails to consider several facts critical to the University's defense. The district court stated that it was not convinced that Ketron's dismissal for excessive absenteeism was either legitimate or nondiscriminatory because Duggins and Beard, two male employees, were absent more than Ketron; yet they were not terminated for excessive absenteeism. Joint Appendix at 269-70. The district court, despite its earlier stated suspicion that UK's defense of excessive absenteeism was not a legitimate, nondiscriminatory reason, went on to state that it would presume that the articulated reason was legitimate and nondiscriminatory. In determining that UK's defense was pretextual and not worthy of credence, step three of the McDonnell Douglas inquiry, the district court found that there was no historical problem of Ketron's absenteeism. Joint Appendix at 271. "All of the Plaintiff's 'excessive absenteeism' which is alleged by the Defendant occurred during May and June 1984, the last few weeks before her termination on June 12, 1984." Joint Appendix at 272. This fact's probative value, however, is lessened when one considers that Ketron had exhausted her sick and vacation leave. The University maintains that the district court erroneously found Duggins, Beard and Ketron to be similarly situated when in fact Ketron had exhausted her vacation and sick leave and had taken significant unpaid leave between March and June 1984, whereas Duggins and Beard had not exhausted their sick and vacation leave. The University claims that as a policy, employees who have exhausted their sick and vacation leave are terminated. The district court, however, did not comment on UK's defense that Duggins and Beard, unlike Ketron, had not exhausted their sick and vacation leave.
 
 
 42
 The district court considered the fact that Ketron had fully recovered from her injury on July 30, 1984, and concluded that requesting the University to wait until she had fully recovered was not an unreasonable accommodation for her injury. The district court, however, did not consider that the medical evidence presented by Dr. Miller indicated that Ketron had fully recovered on May 24, 1984. Ketron proffers Dr. Sweeney's April 30, 1984 statement that "[s]he has some back ache. She thinks she can handle security but will not be able to sit in a guard booth" as evidence of her disability. Dr. Sweeney's statement, however, merely reflects Ketron's opinion, not his medical opinion. Thus Dr. Miller's medical opinion is uncontradicted by the record. Furthermore, Dr. Miller's exam was conducted a month later than Dr. Sweeney's.
 
 
 43
 The district court found that perhaps the most compelling evidence on the issue of retaliation was the timing of events. Joint Appendix at 278. The district court determined that UK's position that these dates are mere coincidence is simply not believable. Id. Moreover, the district court stated that "even without other evidence, these dates alone would be strong evidence for retaliation. " Id. (original emphasis).
 
 
 44
 The events the district court relied upon for the issue of retaliation were:
 
 
 45
 1) November 30, 1982--[Ketron] [b]egan full-time position pursuant to Agreement between Defendant and Plaintiff supervised by the Human Rights Commission and accepted and approved by the EEOC.
 
 
 46
 December 6, 1982--Plaintiff verbally reprimanded.
 
 
 47
 December 13, 1982--Plaintiff received reprimand memo.
 
 
 48
 2) February 17, 1983--Plaintiff files second complaint with EEOC and Human Rights Commission.
 
 
 49
 March 10, 1983--Plaintiff put on probation and receives poor performance review.
 
 
 50
 3) March 29, 1984--[D]etermination of Human Rights Commission in Plaintiff's favor.
 
 
 51
 June 12, 1984--Plaintiff terminated.
 
 
 52
 4) August 7, 1984--Plaintiff files complaint with EEOC and Human Rights Commission.
 
 
 53
 Joint Appendix at 278-79.
 
 
 54
 The district court failed to analyze the timing of these events in the context of other relevant facts in this case. For example, Ketron's probation was extended on January 12, 1983. The date of her performance review was January 31, 1983. Ketron acknowledged being told of her probation extension on January 12 before she filed charges with the EEOC on February 17, 1983. Therefore, the timing of the probation and the EEOC claim does not provide evidence of retaliation. The timing of the March 29, 1984, HRC determination in Ketron's favor and her termination on June 12, 1984 must be analyzed in the context of her injury, the absenteeism that exhausted her sick and vacation leave, and Dr. Miller's medical determination that Ketron was fit to perform her parking duties on May 24, 1984. The district court's reliance on the timing of events outside of their relevant contexts is clearly erroneous. See Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1314 (6th Cir.1989) ("[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim.... In light of intervening events, occurring subsequent to [letter sent by plaintiff to employer's department of human relations], the mere fact that his discharge occurred after a claim of discrimination is, in and of itself, insufficient to [support retaliation claim].").
 
 
 55
 Ketron's termination slip was signed by Paul Dillon who became Ketron's supervisor on March 18, 1984--the day Ketron injured herself in an accident in the parking booth. The district court found, however, that apparently Gary Cunningham and Dillon made the decision to terminate Ketron and that Nancy Ray, the University's affirmative action officer, and others at the University concurred in the decision. Joint Appendix at 255. There is a dearth of probative evidence in the record to support a finding that anyone other than Dillon fired Ketron. The district court's finding of retaliation was clearly erroneous because Dillon was not apprised of the settlement agreement and he was not aware of Ketron's complaints filed with the EEOC and the HRC until after her termination. Dillon's lack of knowledge is probative of the fact that excessive absence, not unlawful retaliation, was the reason for Ketron's termination. There is no basis to find retaliatory discharge where Dillon did not learn of Ketron's HRC charges until after he fired her. The district court's finding of pretext is clearly erroneous based on these facts. Ketron failed to satisfy her burden of establishing that UK's reason was pretextual. We, therefore, conclude that the district court erred in entering judgment in favor of Ketron on her retaliatory termination claim.[5]
 
 III.
 
 56
 In sum, because Ketron and Offutt had the same parking and security responsibilities, Ketron has failed to meet her burden of establishing a prima facie case of discrimination in the terms and conditions of her employment. In addition, Ketron has not satisfied the requirements of a retaliatory discharge claim. Accordingly, we REVERSE the district court's judgment in favor of Ketron and vacate the order granting Ketron reinstatement, restitution, attorneys' fees and costs.
 
 
 
 [1]
 Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq. makes it unlawful for an "employer ... to discriminate against an individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's ... sex ..." 42 U.S.C. Sec. 2000e-2(a)(1)
 
 
 [2]
 Ketron and Jesse Moton, the HRC investigator, testified that a major component of the settlement agreement provided that Ketron would spend 95% of her time in security and only 5% of her time in parking. The terms of the settlement agreement, however, did not specify a security to parking ratio
 
 
 [3]
 Persons assigned to the parking booth were permitted to sit, stand or walk within the booth or around it
 
 
 [4]
 Dillon had not previously been employed by the University and had not met Ketron before March 18, 1984. Dillon was not advised of Ketron's prior charges of discrimination until after he discharged her on June 12, 1984
 
 
 [5]
 Since our disposition of the discriminatory treatment and retaliatory termination issues is determinative of the outcome of this case, we decline to reach the merits of the University's contention that the testimony of the HRC investigators was improperly admitted